FILED
United States Court of Appeals
Tenth Circuit

August 29, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CATHERINE ROBERT,

       Plaintiff – Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS OF BROWN
COUNTY, KANSAS; WARREN L.
PLOEGER, in his individual and official
capacity; STEVE ROBERTS, in his
individual and official capacity; GLEN
LEITCH, in his individual and official
capacity; VENICE SLOAN, in her
individual and official capacities,

       Defendants – Appellees.

No. 11-3092

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:08-CV-02150-EFM)

Penny R. Moylan (Mark L. Bennett, Jr., with her on the briefs), Bennett & Hendrix, LLP,
Topeka, Kansas, for the Plaintiff-Appellant.

Tara S. Eberline (James D. Oliver and Wendell F. Cowan, with her on the brief),
Foulston Siefkin, Overland Park, Kansas, for the Defendants-Appellees.

Before **BRISCOE**, Chief Judge, **EBEL** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Catherine Robert had worked as supervisor of released adult offenders for ten years when she developed sacroiliac joint dysfunction. After a lengthy leave of absence, including the period authorized by the Family and Medical Leave Act ("FMLA"), Robert remained unable to perform all of her required duties, and she was terminated. For the reasons stated hereafter, we conclude that Robert's discharge did not constitute discrimination in violation of the Americans with Disabilities Act ("ADA"), retaliation in violation of the FMLA, breach of contract, or abridgment of procedural due process.

**I**

Catherine Robert began supervising felony offenders in Kansas' Twenty-Second Judicial District in 1995, and she became a Brown County employee when it assumed control of the program in 2003. Her role as an Adult Intensive Supervision Officer required her to oversee adult offenders in an effort to minimize recidivism, facilitate reentry into society, and protect the community. Her job description lists eighteen "essential functions," including performing drug screenings, coordinating with service providers, ensuring compliance with court orders, and testifying in court. In sections on working conditions and location, the document notes that the job requires "considerable fieldwork . . . throughout the 22nd Judicial District," "visits in less than desirable

- 2 -

environments," and "potentially dangerous situations in field/office contacts."

Robert began to experience severe pain in her back and hips in January 2004. Her condition was eventually diagnosed as sacroiliac joint dysfunction. She scheduled surgery for her condition in April. In the meantime, walking became impossible, and she used crutches and later a wheelchair to get around. She continued to work from the office, though some adjustments were necessary; for example, she participated in court hearings by telephone.

In the weeks immediately preceding her surgery, and again during her recovery, Robert worked from home by auditing case files for closed cases. During this time, she was unable to visit offenders at their homes or in jail, and she was similarly unable to supervise drug and alcohol screenings. As a result, other employees took up those tasks for her. According to Venice Sloan, Robert's supervisor, the increased workload for other employees created tension and ultimately contributed to one employee's resignation. Robert returned to the office in July or August 2004 and was eventually able to resume all of her work activities.[1]

Her good health, however, was fleeting. In November 2005, she fell down the stairs in the Brown County courthouse. Shortly thereafter, symptoms of her joint dysfunction returned, leading her to schedule another surgery for April 2006. As before,

---

[1] Because Robert was a new Brown County employee, the days she was wholly unable to work outnumbered her reserved sick days. However, Sloan allowed her to use future sick days with the understanding that she would pay them back after her recovery.

Robert continued to come in to the office prior to the operation, but she was unable to perform site visits, testify in court, or supervise screenings. Once again, her co-workers had to assume those duties.

Because Robert was injured at work, Brown County's workers' compensation insurance covered her medical care. Linda Naylor was assigned to manage Robert's claim and act as a liaison between Robert's care providers and Brown County. Naylor was not an employee of the county; rather, she worked for a case management provider that was contracted by a third-party insurance administrator used by the county's insurance provider.

Several documents were prepared to account for Robert's absence during her surgery and recovery. Robert submitted a "Leave of Absence" form, which Sloan signed, requesting leave beginning the day before her surgery. The date of return was left blank. Sloan provided Robert with a document stating that Robert had the right to up to twelve weeks of job-protected leave under the FMLA, and that Robert's requested leave would be counted against her leave entitlement. In addition, Robert was required to furnish a "fitness-for-duty" certificate prior to reinstatement. Sloan and Robert also both signed a document entitled "Procedures during Cathy's Surgery and Recovery." The document stated that Robert's surgery and recovery could last eight to ten weeks, but that she could work some hours from home once the county received a written doctor's authorization clearing her for light duty.

Surgery went as planned. Robert's FMLA protected leave expired on July 5,

2006. On July 17, Robert and Naylor attended a follow-up appointment. After examining Robert, the surgeon predicted that she might be able to walk with a cane in two to three weeks, and unassisted two weeks after that. He told Robert that she could work on a computer from home, and prepared a "Work Status Report" to this effect. However, the surgeon did not give a copy of this report to Robert. Naylor claims to have not received a copy either, and there is no evidence in the record that either Sloan or any Brown County employee received a written release before Robert's termination.

It is unclear what information Sloan received regarding Robert's prognosis. Naylor's notes indicate that she told Sloan that Robert would be able to walk with a cane in three to four weeks. According to Sloan, Naylor told her Robert would not be able to come into the office for a couple months. Sloan's journal notes are somewhat oblique but suggest that she understood Naylor to say that Robert could, in the best of scenarios, return to work with a cane in a month.

At this point, Robert had exhausted her FMLA, sick, and vacation leave, and Sloan recommended that the Board terminate her employment. On July 31, the Board voted to terminate Robert. Sloan, who considered Robert a friend, insisted on delivering her termination letter in person. Unbeknownst to Sloan, Robert's husband recorded the emotional conversation. Sloan told Robert that the county commissioners had decided to terminate her because she was unable to return to work at full capacity after her leave ended. Robert was shocked and upset, but acknowledged she was "an at-will employee, okay, and it's up." In fact, she recognized her at-will employment status several times

during the conversation.

Robert then sued the county, the commissioners, and Sloan. She claimed that her termination constituted unlawful retaliation for her use of FMLA leave, discrimination under the ADA, breach of contract, and violation of her procedural due process rights under the Fourteenth Amendment, along with other claims not relevant to this appeal. The district court granted summary judgment in favor of the defendants on all claims. She appeals to us.

## II

We review a summary judgment grant de novo, "viewing the evidence in the light most favorable to the nonmoving party." Howard v. Waide, 534 F.3d 1227, 1235 (10th Cir. 2008). Summary judgment is warranted only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

## A

To state a prima facie case for discrimination under the ADA, Robert must establish that: (1) she is disabled; (2) she was qualified, with or without reasonable accommodation, to perform the essential function of her job; and (3) her employer discriminated against her because of her disability. Taylor v. Pepsi-Cola, 196 F.3d 1106, 1109 (10th Cir. 1999). The district court resolved this case on the second prong. Because we agree that Robert was not qualified, we do not address the other requirements.

To determine whether Robert is a "qualified individual," we consider two criteria. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1190 (10th Cir. 2003). First, we must assess whether her impairment prevented her from performing the essential functions of her job. Id. If so, we must then determine whether she might have nevertheless been able to perform those functions if the county provided her a reasonable accommodation. Id.

Robert concedes that she could not work outside her home when Brown County terminated her. But supervising offenders in-person was clearly an essential function of her position. So too was conducting visits to their homes and workplaces. On this score, we must defer to Sloan's testimony that supervising offenders in person was a "necessary" component of her position. See Davidson, 337 F.3d at 1191 ("[C]ourts must give consideration to the employer's judgment as to what functions of a job are essential" though "such evidence is not conclusive"); 42 U.S.C. § 12111(8). Our conclusion is bolstered by the fact that Robert's absence caused strain in her small office. See 29 C.F.R. § 1630.2(n)(2)(ii) ("limited number of employees available among whom the performance of that job function can be distributed" is relevant to essential-function inquiry). Furthermore, Sloan testified that Robert dedicated fifty percent of her time to these site visits when she was able; even according to Robert, the portion was twenty-five percent. The offender supervision officer job description further confirms the importance of fieldwork to her position; the fact that the location of her duties is specified in the "Working Conditions" and "Job Locations" sections, rather than the "Essential

- 7 -

Functions" section, does not render her fieldwork nonessential. Cf. Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1121-22 (10th Cir. 2004) ("attendance, supervision, and teamwork" were essential functions of job even though they were not listed on the job description).

Nor do we see the county's willingness to excuse Robert's inability to perform site visits as evidence that those duties were nonessential. To be sure, we have often said that the essential-function inquiry turns on "whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement." Tate v. Farmland Indus., Inc., 268 F.3d 989, 993 (10th Cir. 2001); see also Davidson, 337 F.3d at 1191 (quoting Tate). But a plaintiff cannot use her employer's tolerance of her impairment-based, ostensibly temporary nonperformance of essential duties as evidence that those duties are nonessential. To give weight to such a fact would perversely punish employers for going beyond the minimum standards of the ADA by providing additional accommodation to their employees. See Basith v. Cook Cnty., 241 F.3d 919, 930 (7th Cir. 2001) ("We do not believe it wise to consider the special assignment as proof that delivery was not an essential function because it would punish Cook County for going beyond the ADA's requirements."). Thus, Brown County's willingness to retain Robert in 2004 despite her inability to perform site visits for several months does not make those visits nonessential. For the same reason, we assign no particular import to Sloan's statement that she would not have recommended the county terminate Robert in July had Sloan received a doctor's authorization stating that Robert could work from home.

- 8 -

Although site visits and other out-of-office work were an essential function of her position, Robert would be nonetheless qualified if she could have performed those duties with a reasonable accommodation. See Davidson, 337 F.3d at 1190. In light of Robert's complete inability to perform site visits at the time of her firing, the only potential accommodation would be a temporary reprieve from this essential function.[2] Our precedents recognize that a brief leave of absence for medical treatment or recovery can be a reasonable accommodation. See Cisneros v. Wilson, 226 F.3d 1113, 1129 (10th Cir. 2000), overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001); Taylor, 196 F.3d at 1110; Rascon, 143 F.3d at 1334.

There are two limits on the bounds of reasonableness for a leave of absence. The first limit is clear: The employee must provide the employer an estimated date when she can resume her essential duties. See, e.g., Cisneros, 226 F.3d at 1130; Rascon, 143 F.3d at 1334. Without an expected end date, an employer is unable to determine whether the

---

[2] Robert argues that working from home was a reasonable accommodation, but this argument ignores the obvious fact that she could not perform site visits from her house. When an individual can execute the essential functions of her job from home, working remotely may be a reasonable accommodation. When a disability renders an employee completely unable to perform an essential function, however, the only potential accommodation is temporary relief from that duty. See Rascon v. US West Commc'ns, Inc., 143 F.3d 1324, 1333-35 (10th Cir. 1998) (holding that a four-month leave of absence could be a reasonable accommodation), overruled on other grounds by New Hampshire v. Maine, 535 U.S. 742 (2001). Robert asserts that, because she could work from home at the time of her termination, she only required excusal from her in-person duties, and not an all-encompassing leave of absence. But we see no reason why the principles established in our leave-of-absence cases should not control in cases where a disability temporarily prevents an employee from performing some essential functions of her job.

temporary exemption is a reasonable one.

The second is durational. A leave request must assure an employer that an employee can perform the essential functions of her position in the "near future." Cisneros, 226 F.3d at 1129 (quotation omitted). Although this court has not specified how near that future must be, the Eighth Circuit ruled in an analogous case that a six-month leave request was too long to be a reasonable accommodation. Epps v. City of Pine Lawn, 353 F.3d 588, 593 (8th Cir. 2003).

The district court held that Robert's needed accommodation exceeded both limitations on reasonability: It found that Robert failed to provide a definite estimate of her ability to resume site visits and that any further exemption following six months of temporary accommodation would be unreasonable as a matter of law. Because we take the district court's view of the first matter, we do not address the potential that the accommodation exceeded reasonable durational bounds.

There is no evidence in the record that Robert's employer had any estimation of the date Robert would resume the fieldwork essential to her position. Although the doctor's prognosis varied before and after the surgery, Naylor told Sloan on July 19, 2006—just after Robert's follow-up appointment and shortly before she was terminated—that Robert could be walking with a cane in three to four weeks.[3] However,

---

[3] This is the account most favorable to Robert; according to Sloan, Naylor told her Robert would not be able to walk even with crutches for "a couple of months."

Robert questioned whether this time frame was "too fast," and testified that she assumed her job would be protected "regardless of the length" of her recovery.[4] In any event, the doctor's prediction that Robert could walk with a cane in a month's time does not suffice to assure the county that she would then be able to perform site visits and other fieldwork. As Robert herself recognized, she needed near-full mobility to ensure her safety as she visited felony offenders in their homes, workplaces, and treatment facilities, an activity that could be dangerous.[5] Accordingly, the record shows that, at the time of her termination, the county did not have a reasonable estimate of when she would be able to resume all essential functions of her employment. As such, the only potential accommodation that would allow Robert to perform the essential functions of her position was an indefinite reprieve from those functions—an accommodation that is unreasonable as a matter of law. Rascon, 143 F.3d at 1334. For that reason, she was not a qualified individual under the ADA and her claim of discrimination fails.

**B**

Robert asserts that her termination was also unlawful retaliation for her use of

---

[4] In fact, according her doctor's records, Robert remained totally disabled until, at the earliest, nearly four months after her termination.

[5] Robert acknowledged this fact at a post-termination meeting with Naylor in September 18, 2006. Naylor's notes reveal that even though Robert was able to walk with the help of a crutch, she did not think she could perform site visits unassisted because of their sometimes hazardous nature. For her part, Robert claims she never said she was unable to perform her former job at that date, but that is irrelevant: The point is that Robert acknowledged that site visits required heightened mobility beyond assisted ambulation.

protected medical leave.[6] This court analyzes such claims under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 494, 802-04 (1973). See Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997). To establish a prima facie case of FMLA retaliation, an employee must prove that she: (1) availed herself of a protected right under the FMLA; (2) was adversely affected by an employment decision; and (3) that there was a causal connection between the two actions. Id. at 1325. The first two elements are undisputed. We further assume without deciding that the brief interval between the expiration of Robert's leave and her termination is sufficient to establish the causal connection. Cf. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that Tenth Circuit precedent holds that a one and one-half month period is sufficient proof of causal connection, but that a three month interval, standing alone, is not). Under the McDonnell Douglas framework, the burden then shifts to the county to offer a legitimate reason for her termination, and if it does, then back to Robert to present

---

[6] Robert did not raise a claim for interference under the FMLA. An FMLA interference claim is based on an employer's alleged denial of an employee's FMLA rights, including a wrongful refusal to restore an employee after the expiration of the protected leave. In contrast, a retaliation claim is premised on an adverse employment action that was allegedly motivated by the employee's choice to take the protected leave. See Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001); see also Valdez v. McGill, 462 F. App'x 814 (10th Cir. 2012) (unpublished). In the typical retaliation claim, the "employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work." Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287-88 (10th Cir. 2007).

- 12 -

evidence to suggest the stated reason was pretextual.

We conclude that Robert has not undermined the county's legitimate reason for her termination: that she failed to return to work with the required release after she exhausted her FMLA leave. Robert insists that Brown County should have known the doctor released her to work from home as of July 17. However, no individual—neither Robert, her husband, Naylor, nor the doctor—testified that he or she delivered the release to Sloan. And Sloan maintains she did not receive it. Even if Sloan had received the release, Brown County was not required to allow Robert to work from home after her FMLA leave expired. See Part II.A., supra (holding that indefinite exemption from essential functions was not a reasonable accommodation). Thus, we conclude that Robert could not return to her job, with or without reasonable accommodations, when she was terminated on July 31, and certainly not when her FMLA leave ended on July 5.

Robert argues that the allegedly differing justifications Sloan offered in conversation and in writing in her termination letter show evidence of pretext. But despite different phrasing, the underlying message was consistent: Robert was let go because she was unable to perform her job functions. We also find unpersuasive Robert's arguments relating to a county policy distinct from the FMLA that allowed employees to request unpaid leave. The fact that Robert might have requested additional leave—she did not formally ask for leave under this policy, and the county was not required to grant it—simply does not demonstrate that the county's stated reason for termination was pretextual.

- 13 -

## C

The district court was also correct in concluding that Robert could not, as a matter of law, prevail on her state-law contract claim. Robert asserts that the county breached both express and implied employment contracts by terminating her after her failure to return to work.

In Kansas, public employment is presumptively at-will. Farthing v. City of Shawnee, 39 F.3d 1131, 1136 (10th Cir. 1994). To override this presumption, a written contract must expressly fix the duration of employment or otherwise limit the employer's ability to discharge. Johnson v. Nat'l Beef Packing Co., 551 P.2d 779, 782 (Kan. 1976); Cussimanio v. Kan. City S. R.R., 617 P.2d 107, 111 (Kan. App. 1980). As she did below, Robert argues that two documents—the document describing the procedures to be followed during her convalescence and the form approving her leave of absence—created express employment contracts. But neither of these documents can be construed as creating a limited term of employment or overriding the county's stated at-will policy. Thus, those documents are incapable of supporting an action for breach of contract, regardless of whether the prescribed procedures were followed.

Absent an express agreement, Kansas law enforces an implied employment contract only when the circumstances demonstrate a mutual intent to contract. Anglemeyer v. Hamilton Cnty. Hosp., 58 F.3d 533, 537 (10th Cir. 1995). Robert argues that she and Sloan agreed that she would be allowed to work from home and reinstated whenever she recovered, thus creating an implied contract. As the district court correctly

- 14 -

concluded, however, the record cannot sustain this argument. After Sloan delivered the news of her termination, Robert repeatedly acknowledged that she was an at-will employee and that the county had the power to terminate her for any reason. Moreover, Robert admitted that neither Sloan nor any other employee told her that her job would be held open indefinitely. Thus, the district court was correct to grant Brown County summary judgment on the contract claim.

## D

Robert's § 1983 procedural due process claim fails for the same reason as her contract claim: her employment was at-will. Kansas courts have been quite clear that at-will employees lack a property interest in their position. See <u>Farthing</u>, 38 F.3d at 1136. Absent a property interest, there can be no violation of Due Process.

## III

**AFFIRMED**.