FILED
United States Court of Appeals
Tenth Circuit

March 18, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SCOTT WEHRLEY,

        Plaintiff - Appellant,

v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,

        Defendant - Appellee.

No. 12-1079
(D.C. No. 1:10-CV-01567-PAB-BNB)

_____

**ORDER**
_____

Before **HARTZ**, **BALDOCK**, and **GORSUCH**, Circuit Judges.
_____

This matter is before the court as a follow up to our order dated January 24, 2013 withdrawing the court's previous Order & Judgment, and in addition on the appellant's *Petition For Panel Rehearing and Rehearing En Banc*. We also reviewed the appellee's response to the request for rehearing, which was filed on January 30.

Upon consideration, we grant panel rehearing in part, and direct the clerk of court to issue the Order & Judgment attached to this order as the new decision of the court. Beyond the amendments included in our new decision, the request for panel rehearing is denied.

The new Order & Judgment, as well as the petition for en banc rehearing and the response, were circulated to all the judges of the court who are in regular active service. As no judge called for a poll, the petition for en banc consideration is denied.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

March 18, 2013

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

SCOTT WEHRLEY,

        Plaintiff-Appellant,

    v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,

        Defendant-Appellee.

No. 12-1079

(D.C. No. 1:10-CV-01567-PAB-BNB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BALDOCK**, and **GORSUCH**, Circuit Judges.
_____

Plaintiff Scott Wehrley worked as a field claim adjuster for Defendant American Family Mutual Insurance Company. While investigating a roof claim in 2007, he fell from a ladder and injured his knee and back. He quickly returned to work, where Defendant allowed him to stay off ladders. Although a doctor removed all work restrictions six months after the fall, Plaintiff challenged this determination and obtained medical restrictions from roof-related claims. Defendant accommodated these restrictions for a time, but finally told Plaintiff his job would be in jeopardy if he could not return to roof claims. Defendant then terminated Plaintiff's employment, more than a

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

year after the initial accident. Plaintiff filed this suit, raising several federal and state-law claims. The district court granted Defendant summary judgment. Plaintiff appealed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

Plaintiff began working for Defendant in 1999, and took a position as a property claim field senior adjuster in 2006. His duties in that position included, among other things, on-site property inspections. The position's job description said the job required "the ability to work in high, precarious places between 1 and 33% of the time," "the ability to climb or balance between 1 and 33% of the time," and "the ability to stoop, kneel, crouch or crawl between 1 and 33% of the time." Appellant's App., vol. I at 97–98. It went on: "The information in this job description is intended to describe the essential job functions required of those assigned to this job." Id. at 98. In the unit in which Plaintiff worked, about fifty-seven percent of claims were roof-related claims. Id., vol. IV at 418.

In June 2007, Plaintiff fell from a ladder while inspecting a roof and injured his knee and lower back. He filed a workers' compensation claim, and his supervisor, Jeff Bourcy, assigned him to desk work until he could walk. Upon his return to work, Plaintiff informed Bourcy that he had "extensive experience and skills sets in all areas of processing insurance claims" and could do any type of work Defendant needed him to. Id., vol. I. at 143. After Plaintiff was off crutches, Bourcy began assigning him to field claims that did not involve roofs or ladders. In December 2007, Defendant's workers' compensation doctor determined that Plaintiff had reached maximum medical

2

improvement and removed all Plaintiff's work restrictions. Plaintiff nevertheless requested an independent medical examination. The doctor who conducted this examination in April 2008 concluded Plaintiff should avoid kneeling or crawling when possible, but that some kneeling and crawling would be acceptable. Bourcy then reassigned Plaintiff to roof claims, but Plaintiff quickly obtained ladder and roof restrictions from the worker's compensation doctor. In July 2008, that doctor determined Plaintiff needed knee surgery and placed Plaintiff on permanent work restrictions.

On July 21, 2008, Plaintiff discussed with Bourcy his need for surgery and informed him he had surgery scheduled for July 30. Bourcy assured Plaintiff he was doing his job well, and Plaintiff reiterated that he was willing and able to do any type of insurance work that Defendant needed him to do. Bourcy followed up that conversation with an email referring Plaintiff to Defendant's Family and Medical Leave Act (FMLA) coordinator "to discuss FMLA possibilities as soon as you can." Id., vol. II at 313. When Defendant's workers' compensation insurer, Sentry, declined to cover the surgery, Plaintiff postponed the surgery and challenged Sentry's denial of coverage. Bourcy advised Plaintiff to have his personal insurer cover the surgery. Bourcy asked on August 6, 2008, whether Plaintiff had filed for FMLA leave. Plaintiff said he planned to apply for FMLA once the surgery was scheduled, but that he was waiting to hear back from his insurance company. Bourcy told Plaintiff this course of action was reasonable.

On August 22, 2008, Bourcy told Plaintiff that if he did not perform roof claims, his job could be in jeopardy. Bourcy said climbing roofs was an important part of the job and Plaintiff's failure to perform roof claims increased the work for other adjusters. On

3

August 28, 2008, Bourcy again asked Plaintiff if he had received a response from his personal insurance company or if he had applied for FMLA leave. Plaintiff responded no to both questions. Bourcy then terminated Plaintiff's employment, citing his inability to perform roof inspections. Plaintiff asked if there were "any other job positions posted that I could have," and Bourcy replied that he had not seen any that day. Id., vol. I at 144. An Employee Relations Specialist with Defendant, Kristy Ledgerwood, indicated that she checked Defendant's open positions at the time. She did not find any open positions in the Denver care center. Ledgerwood did not remember whether she checked for open desk positions in other areas, such as casualty or automobile claims. Plaintiff introduced a list of Defendant's job postings from the time surrounding his firing. That list includes positions for which Plaintiff asserts he was qualified, such as a "Casualty Claim Desk Adjuster" in Denver posted on August 12, 2008. Id., vol. II at 171. Plaintiff's termination letter said, "You are not eligible for rehire consideration at American Family Insurance."[1] Id., vol. II at 309. Sometime after Plaintiff's firing, Sentry agreed to cover his surgery.

Plaintiff filed this suit in state court, and Defendant removed it to federal court.

---

[1] Defendant claims it was willing to rehire Plaintiff, relying on a printout of its electronic separation form. That form has a box checked next to "No" after the question "Would you rehire?" Appellant's App., vol. III at 335. But in the "Comments" window below, Bourcy wrote, "I would reccomend [sic] re-hire if it were for inside position, not requiring ladder/roof work." Id. at 336. Because Plaintiff has introduced his termination letter, which directly rebuts Defendant's evidence, Plaintiff has created a factual dispute. On appeal from summary judgment, we must resolve all factual disputes in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007). Consequently, we must assume Defendant was unwilling to rehire Plaintiff to any other position.

4

The Second Amended Complaint asserted (1) discrimination in violation of the Americans with Disabilities Act (ADA), (2) violation of Colorado public policy, (3) retaliation under the FMLA, and (4) retaliation under the ADA. On Defendant's motion, the district court granted summary judgment in Defendant's favor on all four claims. Plaintiff now appeals. We initially entered an order and judgment affirming the district court. As to Plaintiff's ADA discrimination claim, the district court held that Plaintiff was not substantially impaired in any major life activity. We affirmed on the alternative basis that Plaintiff had failed to introduce sufficient facts showing he was able to perform the essential functions of his job. We stopped short of discussing whether Plaintiff was eligible for reassignment to another position in Defendant's employ.

Plaintiff then sought panel rehearing and rehearing en banc, pointing to our decision in Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) (en banc), a decision he did not cite in his opening brief and only discussed perfunctorily in his reply brief. Midland Brake indicates that our initial decision was at least incomplete, and perhaps wrong. Under Midland Brake, we must consider not only whether an employee is qualified to perform the essential functions of his current job, but also whether he is qualified to perform the essential functions of "an available reassignment job within the company." Midland Brake, 180 F.3d at 1161. In light of Midland Brake, we grant the petition for panel rehearing, and issue this amended opinion. Rather than decide whether Plaintiff was entitled to reassignment, we will take the same tack as the district court and ask whether Plaintiff was disabled under the ADA. We review the district court's grant of summary judgment on all Plaintiff's claims de novo, and view the evidence in the light

most favorable to the non-moving party. Robert v. Bd. of Cnty. Comm'rs, 691 F.3d 1211, 1216 (10th Cir. 2012).

## II.

We turn first to Plaintiff's ADA discrimination claim. The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). ADA discrimination claims follow the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To establish a prima facie case of discrimination, Plaintiff must show (1) he was disabled, (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job, and (3) his employer discriminated against him because of his disability. Robert, 691 F.3d at 1216.

Under the ADA, a person is disabled if he (1) has a physical or mental impairment that substantially limits one or more of his major life activities, (2) has a record of such an impairment, or (3) is regarded by his employer as having such an impairment. 42 U.S.C. § 12102(1). Plaintiff claims his knee and back injuries were a qualifying physical impairment. We follow a three-step process to determine whether an impairment exists. Plaintiff must (1) show he has a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show that the impairment substantially limits one or more of those activities. Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003). The parties appear to agree that Plaintiff's knee injury, at least, is a recognized impairment. But they dispute whether Plaintiff was substantially impaired in any major life activity.

6

Before we can answer this question, we must clarify what statutory scheme applies. In 2008, Congress passed the ADA Amendments Act, Pub. L. No. 110-325, 122 Stat. 3553, which had a stated purpose of superseding a number of Supreme Court cases. The Amendments Act also created a statutory definition of "major life activities." See 42 U.S.C. § 12102(2)(A). But the Act did not take effect until January 1, 2009, which is after the alleged discrimination in this case. We have held that the Amendments Act does not apply retroactively, so we must apply the law as it stood in 2008, when Defendant fired Plaintiff. Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1144 (10th Cir. 2011).

The pre-2009 version of the ADA did not define "major life activity," but the Department of Labor regulations defined the term as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2008 version). Prior to the ADA Amendments Act, the Supreme Court said the phrase "major life activity" needed to be "interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002), superseded by statute ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Accordingly, the Court said "major life activities" referred to "those activities that are of central importance to daily life." Id. Under this standard, Plaintiff has failed to raise a dispute of material fact regarding his disability.

Plaintiff argues he was impaired in the following activities: squatting, lifting more than twenty-five pounds on a regular basis, kneeling, crawling, climbing ladders, working

7

at unprotected heights, prolonged walking, sleeping, sitting or standing for more than thirty minutes at a time; household tasks such as gardening, painting, changing light bulbs; and cleaning high and low areas like gutter drains, the garage, the basement, the bathtub, and under low pieces of furniture. He is also unable to engage in recreational activities such as skiing, waterskiing, golfing, camping, hiking, and fishing. Most of these activities are not of central importance to daily life, but at least some of them are. For example, walking is one of the activities listed in the regulations. We would also venture that sleeping, sitting, and standing are central to daily life.[2] We have also said "personal and household chores" are major life activities, Carter, 662 F.3d at 1143, but we did so in the context of chores such as cooking food and doing laundry, id. at 1139. Unlike cooking and washing clothes, cleaning one's gutters or bathtub is not central to daily life. But Plaintiff has identified four activities that we agree are major life activities: walking, sleeping, sitting, and standing.

The next question is whether Plaintiff was substantially impaired in any of these activities when he was fired. The 2008 Department of Labor regulations defined "substantially limit[ed]" as being

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

---

[2] In the ADA Amendments Act, Congress added sleeping and standing to its list of major life activities. See 42 U.S.C. §12102(2)(A).

8

29 C.F.R. § 1630.2(j)(1) (2008). Plaintiff submitted an independent medical examination by Dr. Linda Mitchell conducted in February 2010. Dr. Mitchell noted that "prolonged walking or standing" made Plaintiff's knee pain "worse." Appellant's App., vol. II at 192. She noted, "He is worse with prolonged sitting or standing and has to change positions about every 30 minutes." Id. Plaintiff also submitted a report by a rehabilitation counselor, Helen Woodard, completed in January 2011. Under the heading "current status," the report notes that Plaintiff "has difficulty walking very far and pain disrupts his sleep." Id. at 275. The report opines that his injuries caused "disabilities that result in substantial limitations that affect [Plaintiff's] ability to do one or more major life activities." Id. at 277. Specifically, the report noted "limitations" in lifting, squatting, kneeling, crawling, climbing, working on ladders or at unprotected heights and that his disabilities "affect his ability" to do household activities such as cleaning. Id. Plaintiff's own affidavit says the limitations detailed in these two documents "were in effect and as severe in July and August of 2008 as they were at the time the reports were prepared." Id. at 168.

This evidence does not show Plaintiff was "unable" to perform any major life activities, so we must consider whether he was "significantly restricted" in the manner or duration of performing those activities. See 29 C.F.R. § 1630.2(j)(1) (2008). As to walking and standing, the medical report said only that *prolonged* walking or standing caused Plaintiff knee pain. It does not say the injury restricted Plaintiff's ability to walk or stand in the ordinary course of a day. As to sleeping, the report only indicates that pain "disrupts" or "impacts" Plaintiff's sleep. Id. at 275, 277. It says nothing about the

9

extent or severity of the impact on his sleep. See Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1218 n.10 (10th Cir. 2010) (plaintiff had not shown sleeping trouble made her disabled under the ADA where she did not show how her sleeping problems compared to the average person in the general population "many of whom, of course, have . . . trouble sleeping"). Finally, the fact that Plaintiff has to change positions every thirty minutes while sitting is not a substantial limitation, considering how few daily activities require prolonged sitting in one position. In short, Plaintiff has not introduced enough evidence to overcome summary judgment on the issue of whether he was substantially impaired in a major life activity. So he has not satisfied the first element of a prima facie case of ADA discrimination.

## III.

We next address Plaintiff's ADA retaliation claim. The ADA prohibits both "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter" and "interfer[ing] with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(a), (b). In the absence of direct evidence of retaliation, a plaintiff may make out an ADA retaliation claim under the McDonnell Douglas burden-shifting framework. A prima facie case requires Plaintiff to show (1) he engaged in protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the material adverse action. Reinhardt v. Albuquerque Public Schs. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010). We have held that requests for reasonable accommodation are protected

10

activity under the ADA.[3] Jones v. U.P.S., Inc., 502 F.3d 1176, 1194 (10th Cir. 2007). And, unlike an ADA discrimination suit, a plaintiff in an ADA retaliation suit need not show he suffered from an actual disability as long as he had a "reasonable, good faith belief the statute ha[d] been violated." Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001). Here, the district court concluded Plaintiff had satisfied the second two requirements of a prima facie case. But it concluded he had failed to meet the first prong because "no reasonable jury could find that, in June 2007, [Plaintiff] had a reasonable, good faith belief that simply because he could not descend a ladder he was disabled within the meaning of the ADA." Wehrley v. Am. Family Mut. Ins. Co., 2012 WL 415421, at *9 (D. Colo., Feb. 9, 2012). In the alternative, the court held Plaintiff failed to show pretext for his termination.

We can accept the court's second holding, but not its first. Dr. Mitchell's report noted that "prolonged walking or standing" made Plaintiff's knee pain "worse." Appellant's App., vol. II at 192. Woodard's report said Plaintiff "has difficulty walking very far and pain disrupts his sleep," and noted "limitations" in lifting, squatting, kneeling, crawling, climbing, working on ladders or at unprotected heights and that Plaintiff's disabilities "affect his ability" to do household activities such as cleaning. Id. at 275, 277. Plaintiff says he experienced these conditions at the time Defendant fired him. This evidence is at least sufficient to create a factual issue regarding Plaintiff's

---

[3] To request reassignment, an employee need not use "magic words," but must "convey to the employer a desire to remain with the company despite his or her disability and limitations." Jones v. U.P.S., Inc., 502 F.3d 1176, 1194 n.13 (10th Cir. 2007) (quoting Midland Brake, 180 F.3d at 1172).

11

good faith belief that he was disabled.

The district court focused on the wrong time-frame in considering whether Plaintiff believed he was disabled, looking at Plaintiff's beliefs in June 2007 rather than when he was terminated in August 2008. By the time Defendant fired him, Plaintiff had been placed on work restrictions and was experiencing all the limitations outlined in Dr. Mitchell and Ms. Woodard's reports. Furthermore, the district court considered only Plaintiff's inability to descend a ladder and disregarded his other limitations, such as limitations in walking long distances, lifting, squatting, kneeling, crawling, climbing, and working at unprotected heights. Based on the evidence Plaintiff has presented, a jury could conclude that Plaintiff reasonably believed he was disabled in August 2008.

But the district court is correct that Plaintiff has failed to establish pretext. Defendant says it fired Plaintiff for the non-discriminatory reason that he was unable to perform an essential function of his job—roof inspections.[4] Thus, the burden shifted back to Plaintiff to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1052 (10th Cir. 2011).

_____

[4] Of course, Plaintiff has tried to persuade us this firing *was* discriminatory because Defendant failed to reassign him to another position. But we have already concluded Defendant did not discriminate against Plaintiff in violation of the ADA because Plaintiff was not disabled. Furthermore, an employer's failure to reassign an employee is properly considered as part of an ADA discrimination claim not a retaliation claim, where the relevant question is whether the employer's "motive for taking the adverse action was its desire to retaliate for the protected activity." Proctor v. United Parcel Service, 502 F.3d 1200, 1210–11 (10th Cir. 2007) (quoting Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1218 (10th Cir. 2003)).

12

Plaintiff cannot meet that burden here.  He admits he was unable to perform roof inspections in August 2008.  But he points to several other facts which he says support pretext.  First, another field claim adjuster submitted an affidavit asserting he was unaware of any increased workload as a result of Plaintiff's injury and had never heard any other adjusters complain about Plaintiff's inability to perform roof inspections.  Second, Plaintiff says "a comparison of the number of field assignments given to the adjusters in [Plaintiff's] territory before and after his injury indicates that the number of assignments did not significantly increase and, in some cases, decreased after [Plaintiff's] injury."  Appellant's Br. at 24.  Third, Defendant only notified Plaintiff his job could be in jeopardy a few days before his firing, and previously indicated he was doing a good job.  Fourth, Defendant made no effort to reassign Plaintiff, even though he expressed willingness to work in other positions.  And finally, Defendant told Plaintiff he was ineligible for rehire.

These facts are insufficient to show pretext.  The other adjuster's affidavit does nothing to disprove Defendant's assertion that performing roof inspections was an essential function of the field claim adjuster position.  Nor can we accept Plaintiff's assertion that the workload on other adjuster's stayed level or decreased after his injury.  The only evidence Plaintiff introduces in support of this claim consists of two tables showing the number of "property assignments" to field adjusters in Defendant's northern and southern Colorado regions.  Appellant's App., vol. IV at 423.  But these tables are only for 2008, even though Plaintiff's injury occurred in June 2007.  So these tables tell us nothing about the effect of his injury on the other adjusters' workload.  Bourcy's

13

assurances to Plaintiff that he was doing a good job were perhaps misleading, if Defendant indeed needed Plaintiff to return to roof claims. But they do not suggest Defendant fired Plaintiff for asserting his ADA rights, rather than for his inability to perform the functions of a field claims adjuster.

Finally, Defendant's failure to reassign Plaintiff to a different position and its unwillingness to rehire him do not undermine Defendant's asserted justification for the firing. These facts might have been relevant to Plaintiff's ADA discrimination claim if we had concluded Plaintiff was disabled under the ADA. Employers have a duty, in certain circumstances, to reassign a disabled employee to another vacant job within the company. Midland Brake, 180 F.3d at 1171. But these facts do not suggest Defendant fired Plaintiff for some reason other than his inability to do roof inspections. Because Plaintiff cannot show pretext, Defendant was entitled to summary judgment on Plaintiff's ADA retaliation claim.

IV.

Plaintiff's FMLA retaliation claim, like his ADA claims, is subject to the McDonnell Douglas burden-shifting analysis. To make out a prima facie case, Plaintiff must show (1) he engaged in a protected activity, (2) his employer took a materially adverse action, and (3) a causal connection exists between the protected activity and the adverse action. Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). The district court first held Plaintiff did not engage in protected activity because he never actually took FMLA leave. In the alternative, the court held Plaintiff failed to establish a causal connection between the protected activity and the firing.

14

In support of its first holding, the district court said, "Tenth Circuit law is unsettled as to whether an employee must actually have taken FMLA leave as a prerequisite to a retaliation claim." Wehrley, 2012 WL 415421 at *14. The court cited our unpublished decision in Wilkins v. Packerware Corp., 260 F. App'x 98, 103 (10th Cir. 2008) (unpublished), where we said it was an open question whether "the lawful taking of FLMA leave is a prerequisite to a retaliation claim." But Wilkins only addressed whether someone must *actually be eligible* for FMLA leave in order to bring a retaliation claim. Id. Whether the plaintiff must *actually take* FMLA leave is a different question. Three other circuits have concluded that notifying an employer of the intent to take FMLA leave is protected activity. Pereda v. Brookdale Senior Living Communities, Inc., 666 F.3d 1269, 1276 n.8 (11th Cir. 2012); Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009); Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001) ("The right to take . . . leave pursuant to the FMLA includes the right to declare an intention to take such leave in the future.").

We are persuaded to follow these circuits for two reasons. First, the FMLA requires an employee to provide his employer "not less than 30 days' notice" before taking leave for foreseeable medical treatment. 29 U.S.C. § 2612(e)(2). Because the FMLA expressly *requires* this notice, giving such notice reasonably must be "protected activity." Second, any other view would lead to an absurd result—an employee would be unprotected from retaliation during the thirty or more days prior to taking FMLA leave. As the Third Circuit observed, this "would perversely allow a[n] employer to limit an FMLA plaintiff's theories of recovery by preemptively firing her." Erdman, 582 F.3d at

15

509. We reject this absurd result and hold that giving an employer notice of intent to take FMLA leave, at least where the employee qualifies for that leave, is protected activity for purposes of an FMLA retaliation claim. So Plaintiff has satisfied the first element of a prima facie case.

We also must reject the district court's alternative holding that Plaintiff failed to show a causal connection between his protected activity and his firing. Plaintiff relies on the temporal proximity between his statement of intent to take FMLA leave and his firing. Temporal proximity can be "relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006) (internal quotation marks omitted). "We have emphasized, however, that a plaintiff may rely on temporal proximity alone only if 'the termination is *very closely* connected in time to the protected activity.'" Id. (quoting Anderson v. Coors Brewing, 181 F.3d 1171, 1179 (10th Cir. 1999)). In Metzler, the defendant terminated the plaintiff "at most about 6 weeks after [the defendant] knew [the plaintiff] intended to engage in protected activity and within as little as four weeks of [the plaintiff's] request for FMLA-protected leave." Id. at 1171–72. We said, "Because [the plaintiff's] termination was therefore 'very closely connected in time' to her protected FMLA activity, she has established the third, and final, element of her prima facie case." Id. at 1172 (quoting Anderson, 181 F.3d at 1179) (internal citation omitted). Here, Defendant fired Plaintiff only five weeks after he informed Bourcy he might take FMLA leave. Under Metzler, this temporal connection alone is enough to satisfy the third element of a prima facie case. Because the second element is not in dispute, Plaintiff has

16

met his initial burden under the McDonnell Douglas framework.

The district court ended its analysis here, but we do not. We may affirm summary judgment on any basis supported by the record. See Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008). Once Plaintiff makes out a prima facie case, Defendant must offer a legitimate reason for terminating Plaintiff. Robert, 691 F.3d at 1219. Defendant's proffered reason—that Plaintiff could not fulfill an essential function of his job—is legitimate. So the burden shifts back to Plaintiff to present evidence supporting pretext. Id. As with his ADA retaliation claim, Plaintiff has not adduced sufficient facts to establish pretext. None of the evidence suggests Defendant was opposed to Plaintiff taking FMLA leave. In fact, Bourcy encouraged Plaintiff to contact the FMLA coordinator as soon as possible when his surgery was initially scheduled. Cf. Sabourin v. University of Utah, 676 F.3d 950, 960 (10th Cir. 2012) (supervisor "exploded" when she heard that employee took FMLA leave). Nor do Bourcy's later inquiries regarding whether Plaintiff had taken FMLA leave suggest pretext. Plaintiff had postponed his surgery once, and Bourcy would naturally want to know if Plaintiff would be taking FMLA leave any time soon. And Bourcy assured Plaintiff his actions at the time were "reasonable." So these facts do not establish pretext. Finally, Plaintiff's ineligibility for rehire is not enough to establish pretext in this case. Although an employer's unwillingness to rehire an employee in a position for which he is qualified could suggest pretext, it is not alone sufficient to show pretext. In short, even though Plaintiff had informed Defendant of his intent to take FMLA leave, there is insufficient evidence for a jury to find that Defendant fired Plaintiff *because* he intended to take FMLA leave.

17

V.

We turn finally to Plaintiff's state law claim, over which the district court exercised supplemental jurisdiction. See 28 U.S.C. § 1367(a). Colorado courts have implied a cause of action for retaliation for the exercise of workers' compensation rights. Lathrop v. Entenmann's, Inc., 770 P.2d 1367, 1373 (Colo. Ct. App. 1989). "[S]ince an employee is granted the specific right to apply for and receive compensation under the [Workmen's Compensation Act of Colorado], an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy." Lathrop, 770 P.2d at 1373. Colorado's case law regarding this claim is not well developed, but the claim at the very least requires evidence of a causal connection between the exercise of worker's compensation rights and the firing. See id. at 1372–73 (agreeing with a court that recognized a common law claim "by an employee for wrongful discharge if the employee is discharged in retaliation for pursuing a workmen's compensation claim."). The district court concluded Plaintiff introduced insufficient evidence of this connection.

Plaintiff points to several pieces of evidence that he thinks make the connection. First, Plaintiff challenged the workers' compensation doctor's conclusions by requesting an independent medical evaluation. Second, he repeatedly challenged Sentry's decision to deny him surgery. Third, only a two-month gap separated his request for surgery from his termination. Fourth, Bourcy "pushed" Plaintiff to have his personal insurer cover the surgery, rather than Sentry. And, fifth, Bourcy decided to fire Plaintiff after a conference call that included the attorney involved in Plaintiff's workers' compensation claim.

These facts are not sufficient to overcome summary judgment. The fact that

18

Plaintiff disputed a number of workers' compensation determinations over the nine-month period leading up to his firing suggests a possible motive for retaliation, but it does not undermine Defendant's stated reason for terminating Plaintiff. Furthermore, Bourcy did not "push" Plaintiff to have his personal insurer cover the surgery until *after* Sentry denied coverage. So this evidence does not suggest Bourcy wanted to keep Sentry from having to cover the surgery. At most, it indicates that Bourcy wanted Plaintiff to obtain the surgery through other means once Sentry denied coverage. Finally, none of the deposition testimony related to the conference call suggests that Plaintiff's workers' compensation claim had anything to do with his termination. The mere fact that an attorney involved with that claim was on the phone is not enough to show causation. So Defendant was entitled to summary judgment on this claim.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge