PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ERIC Q. CARROLL,
                    *Plaintiff-Appellant,*

v.

CITY OF WESTMINSTER, A Municipal
Corporation; SAM R. LEPPO,
Westminster Police Department;
JOHN W. MIDDLETON, M.D.,
                    *Defendants-Appellees.*

No. 99-1556

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-94-2634-MJG)

Argued: September 26, 2000

Decided: November 17, 2000

Before WILKINSON, Chief Judge, and MOTZ and
KING, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge King joined.

_____

## COUNSEL

**ARGUED:** David L. Moore, Baltimore, Maryland; Brian Lee Wallace, Baltimore, Maryland, for Appellant. Niccolo Nunzio Donzella, NICCOLO N. DONZELLA, P.A., Baltimore, Maryland; Daniel Karp,

ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellees. **ON BRIEF:** Michelle L. Seidleck, ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellees.

---

**OPINION**

WILKINSON, Chief Judge:

Police Officer Eric Carroll filed this suit challenging his termination by the Westminster Police Department. The Westminster Chief of Police fired Carroll because of a positive drug test indicating heroin use. Although Carroll signed a waiver allowing his urine to be tested at any time, with or without cause, he raises numerous challenges to his test and subsequent termination. The district court dismissed Carroll's claims on summary judgment. We now affirm the judgment.

I.

Eric Carroll was hired by the Westminster Police Department on August 23, 1990. Pursuant to standing policy, Carroll agreed to a detailed background check and signed a drug test waiver. The waiver contained the following statement:

As a condition of employment with the Westminster Police Department, the undersigned employee agree's [sic] that the Police Department may at anytime [sic], with or without cause, require tests relating to the use of any drugs; such tests to include, but not be limited to chemical tests, urinalysis, polygraph, etc; within the condition as a perquisite [sic] to employment with the Westminster City Police Department.

During his May 9, 1993 shift, Carroll went to the hospital complaining of tightness in his chest and fatigue. He was diagnosed as having high blood pressure. The next day Carroll saw Dr. John Middleton. Dr. Middleton was the physician retained by the Westminster Police Department to perform pre-employment and fitness-for-duty

physicals. Dr. Middleton had seen Carroll once before when performing Carroll's pre-employment physical. Carroll knew that Dr. Middleton was the department's physician. Dr. Middleton treated Carroll and placed him on disability leave for three days.

On the morning of May 12, 1993, Westminster Police Chief Samuel Leppo received a tip that Carroll was using heroin. The tipster, Alphonso McNeil, claimed to have known Carroll for twelve or thirteen years. McNeil said he had seen Carroll coming down from a heroin high. McNeil also indicated that he knew Carroll currently was out on sick-leave. At Leppo's request, McNeil provided a work number where Leppo could reach him. Leppo immediately called this number and confirmed that McNeil worked there. Leppo also confirmed that Carroll was currently out on sick leave.

McNeil's tip was not the first to allege drug use by Carroll. Five months earlier, the police chief of a neighboring jurisdiction passed on a tip to Leppo alleging that an African-American Westminster Police Officer was using illegal drugs. At the time of the call, Carroll was the only African-American Westminster Police Officer. Leppo asked for the name of the source so he could investigate. Leppo never received the name of the tipster and thus never investigated this allegation.

On May 12, 1993, the same day that Leppo received the tip from McNeil, Officer Carroll returned to Dr. Middleton. Before Carroll arrived, however, Chief Leppo called Dr. Middleton. Based on the tip from McNeil, Leppo asked Dr. Middleton to test Carroll for drugs. Middleton twice asked whether he should tell Carroll about the drug test. Both times Leppo replied in the negative. According to Leppo, the drug test waiver that Carroll had signed obviated the need for test-specific notice. Dr. Middleton put a notation in Carroll's chart reflecting Leppo's order to test Carroll for drugs without Carroll's knowledge. When Carroll arrived for his appointment, Dr. Middleton requested a urine sample in order to test it for the presence of blood. After conducting this test, Dr. Middleton transferred the urine to another container so it could be tested for drugs. Dr. Middleton did not tell Carroll about the drug test. Carroll's urine tested positive for codeine and morphine, indicating heroin use.

As a result of the positive drug test, Chief Leppo suspended Carroll pending an investigation and hearing. On December 2, 1993, a hearing board convened pursuant to Maryland's Law Enforcement Officer's Bill of Rights (LEOBR). The Board found Carroll guilty of seven charges and recommended termination as the appropriate punishment for each. On December 20, 1993, Leppo accepted the Board's recommendation and terminated Carroll.

Carroll filed this suit in federal district court alleging a civil conspiracy, defamation, and violations of his Fourth Amendment and substantive due process rights. After full discovery, the district court granted summary judgment to the defendants with respect to all of Carroll's claims. The district court also found that even if Carroll's claims had merit, summary judgment would still be proper because both Leppo and Dr. Middleton were entitled to qualified immunity. Carroll now appeals.

## II.

Our analysis in the area of workplace drug testing follows the Supreme Court's decisions allowing random, suspicionless testing under certain circumstances. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989); *Nat'l Treasury Union Employees v. Von Raab*, 489 U.S. 656 (1989). The first question is whether urinalysis is a search. Unquestionably, it is. As the Supreme Court noted in *Skinner*, "it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . [and] that these intrusions must be deemed searches under the Fourth Amendment." 489 U.S. at 617.

The Fourth Amendment, however, "does not proscribe all searches and seizures, but only those that are unreasonable." *Id.* at 619. In *Skinner*, the Court held that "the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 489 U.S. at 619 (internal quotations omitted).

Here, the government's interests are not just legitimate, they are "compelling." *Von Raab*, 489 U.S. at 670. First, the government has a compelling interest in ensuring that the judgment of armed officers

is not impaired by the use of illegal narcotics. In *Von Raab*, the Supreme Court noted that armed officers "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." 489 U.S. at 670 (quoting *Skinner*, 489 U.S. at 628). In light of this risk, the Supreme Court held that armed officers could be subject to random drug tests so that the public does not have to "bear the risk that employees who may suffer from impaired perceptions and judgment" will be employed in positions "where they may need to employ deadly force." *Id.* at 671. *See also Thomson v. Marsh*, 884 F.2d 113 (4th Cir. 1989) (upholding random drug testing of workers at a chemical weapons plant).

Second, the government has an interest in ensuring that those engaged in drug interdiction efforts are not themselves drug users. Again in *Von Raab* the Supreme Court found that "[t]he public interest demands effective measures to bar drug users from positions directly involving the interdiction of illegal drugs." 489 U.S. at 670. The Supreme Court determined that society's interest in deterring drug use "could be irreparably damaged" if police officers "were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." *Id.*

Finally, the state has a general interest in ensuring that those who have sworn to uphold the law are not themselves law-breakers. According to the Supreme Court, "the Government has a compelling interest in ensuring that" law enforcement officers "do not use drugs even off duty, for such use creates risks of bribery and blackmail against which the Government is entitled to guard." *Von Raab*, 489 U.S. at 674.

Carroll claims that *Skinner* and *Von Raab* are distinguishable for two reasons. First, unlike the employees in those cases, he maintains he was not told that his urine would be tested for drugs when he provided the sample. His privacy interests were doubly violated, he argues, because a sensitive procedure took place without his knowledge.

Carroll admits, however, that the waiver he signed allowed the Department to test him for drugs "at anytime, with or without cause." He also admits to knowing that Dr. Middleton was the Department's

physician. A police officer's knowledge that he is subject to random drug tests is of no small importance. Although "the precise time of the test will be unknown, the fact that [employees] are subject to this search procedure will not be a surprise," and thus "[t]he privacy intrusion consequently is less severe." *Rutherford v. Albuquerque*, 77 F.3d 1258, 1262 (10th Cir. 1998) (internal quotations and citations omitted). *See also Von Raab*, 489 U.S. at 667 (random tests are permissible so long as employees have generalized notice that they are subject to the testing requirement). The waiver clearly put Carroll on notice that his urine could be tested for drugs "at any time." Given the breadth of the language in the waiver, it is difficult to argue that Westminster exceeded its authority in testing Carroll. That the Westminster Police Department acted subject to a validly executed waiver thus distinguishes Carroll's case from the *Rutherford* opinion upon which he so heavily relies; unlike Rutherford, Carroll was not subject to "unwarned testing." *Cf. Rutherford*, 77 F.3d at 1262.

Indeed, Carroll admits that he could not, without facing termination, refuse an immediate drug test. Carroll makes no argument as to why the presence or absence of a mere moment's notice marks the constitutional line between permissible and impermissible procedures. Moreover, courts have long recognized that individuals in certain safety-sensitive professions, such as law enforcement, have a reduced expectation of privacy. *See Von Raab*, 489 U.S. at 667; *see also Thomson*, 884 F.2d at 115 (employees at chemical weapons plant have diminished expectation of privacy due to job's special demands and the requirement of extensive testing and probing). Carroll's agreement to a medical exam, a drug screening test, an FBI criminal background check, a credit check, and his execution of a general release of information put Carroll on notice that police officers have a diminished expectation of privacy. *See National Federation of Federal Employees v. Cheney*, 884 F.2d 603, 612 (D.C. Cir. 1989) (civilian police officers who "undergo a variety of privacy diminishing tests and investigations as a condition of employment" have a reduced privacy interest).

Carroll also seeks to distinguish *Skinner* and *Von Raab* because the drug test here was not conducted pursuant to comprehensive regulations permitting only "intrusions [that] are defined narrowly and specifically," *Skinner*, 489 U.S. at 622, so that the "covered employee is

simply not subject to the discretion of the official in the field." *Von Raab*, 489 U.S. at 667 (internal quotation marks omitted). But, contrary to Carroll's contentions, the validity of his drug test does not hinge on the "lack of regulatory limitations" on the "permissible limits" for drug testing. Here the Department had reasonable individualized suspicion that Carroll was abusing drugs. The tipster McNeil claimed to have observed Carroll abusing heroin. McNeil's claim to be an acquaintance of Carroll was supported by his knowledge that Carroll was out sick on May 12, 1993. And the credibility of his accusation was enhanced by his willingness to use his own name and to provide a work phone number where he could be reached. *See United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000) ("Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements."). The Department would have been derelict in its duty if it had ignored a plausible report that one of its officers was abusing drugs. Thus, the district court correctly concluded that Carroll's drug test was reasonable and therefore did not violate the Fourth Amendment's proscription against unreasonable searches and seizures.

As Carroll's counsel conceded at oral argument, the substantive due process and civil conspiracy claims are based on the assumption of a Fourth Amendment violation. In light of our conclusion that there was no Fourth Amendment violation, there is no need to address the merits of these claims. Carroll's defamation claim is moot by virtue of the death of Chief Leppo in 1999. In Maryland, a claim for slander cannot be maintained against the estate of a decedent if the claim arose before the decedent's death. *See* Md. Code Ann., Estates and Trusts, § 8-103(b) (Michie 1991 & Supp. 1999).

III.

*Skinner* and *Von Raab* are clear in their holding that random, suspicionless workplace drug testing is allowed under certain circumstances. Just as the United States Customs officers in *Von Raab* and the railroad personnel in *Skinner*, police officers using illegal drugs have the potential to cause great harm to the public. We find nothing improper in the efforts of the Westminster Police Department to prevent this harm in Carroll's case. Because the drug test conducted on

Carroll's urine was a reasonable search as defined by the Fourth Amendment, we affirm the judgment of the district court.

*AFFIRMED*