**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 6, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERICK WASHINGTON,

Plaintiff-Appellant,

v.

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY, KANSAS;
GARY ORTIZ, in his official and
individual capacities, Assistant County
Administrator; TERRY L. BROADUS,
Administrator, in her official capacity,
Wyandotte County Juvenile Detention
Center; DONALD ASH, Sheriff, in his
official and individual capacities,
Wyandotte County Unified
Government; DOUGLAS BACH, in
his official and individual capacities,
Assistant County Administrator,

Defendants-Appellees.

No. 15-3181

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:14-CV-02108-JTM)**

---

Michael J. Gallagher, Gallagher & Kaiser, LLP, Kansas City, Missouri, for
Appellant.

Henry E. Couchman Jr., Legal Department, Unified Government of Wyandotte
County/Kansas City, Kansas, Kansas City, Kansas, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MORITZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

Roberick Washington was employed as a lieutenant at the Wyandotte County Juvenile Detention Center in Kansas City, Kansas. After a random drug test, he was fired for testing positive for cocaine. Washington filed a civil rights action against the County and several of his co-workers, alleging that the drug test was an illegal search that violated his Fourth and Fourteenth Amendment rights, as well as breached his employment contract. The district court granted summary judgment for the defendants on all claims.

We affirm because the County's random drug test did not violate the Fourth Amendment, since the test furthered the County's need to ensure the safety and welfare of the juvenile residents. Nor did his termination violate any other constitutional or statutory right.

## I. Background

In 1995, Roberick Washington began working for Wyandotte County as a juvenile care worker in the Juvenile Detention Center, which houses juvenile offenders facing criminal charges and serves as an educational and development center for the residents. In 2002, Washington was promoted to juvenile lieutenant. In that position, his job duties included, among other things, classifying inmates based on their behavior. In 2005, while still holding the rank

of juvenile lieutenant, Washington assumed further responsibilities for training other personnel.

After assuming his training responsibilities, Washington still interacted with residents. He continued to classify inmates and occasionally supervised juvenile detention officers, who oversee the residents on the "floor," where residents stay. Washington also conducted disciplinary hearings for residents and filled in for absent floor lieutenants, earning overtime by working night and weekend shifts. Sometimes he would drive the County van to take juveniles to the intake assessment center. And whenever a fight broke out, he and "all employees under juvenile detention would have to go to the floor just for support." App. at 105. Though Washington did not always go, he was supposed to be present.

Wyandotte County has a comprehensive random drug testing policy that applies to employees in "safety sensitive positions." *Id.* at 142. Pertinently, the County's Policy on Substance Abuse and Drug and Alcohol Testing lists "juvenile lieutenant"—Washington's position—as a safety sensitive position. *Id.* at 173. According to the Policy, "failure to pass a drug or alcohol test is just cause for discipline including discharge." *Id.* at 162. The Policy also provides that discipline must be administered in accordance with the Human Resources Guide, which permits suspension from work for a first-time drug offense. The HR Guide, however, expressly "does not modify the status of employees as

employees-at-will or in any way restrict the Unified Government's right to bypass the disciplinary procedures suggested." *Id.* at 177. The Guide also specifies that "[a] more severe penalty than indicated may be imposed if warranted by the circumstances." *Id.* at 178.

In 2012, Washington supplied a urine sample as part of this random drug testing policy, as he had several times in the past. But this time, he tested positive for cocaine. After a second test confirmed the result, Sheriff Donald Ash terminated Washington. Pursuant to the Grievance Procedure detailed in the HR Guide,[1] Washington appealed Ash's decision to Terry Broadus, the administrator of the Juvenile Detention Center. Broadus denied Washington's grievance, and Washington appealed to the County Administrator's Office. After a hearing, Gary Ortiz, an assistant county administrator, upheld Washington's termination. Doug Bach, the deputy county administrator, then wrote to Washington to inform him that after reviewing Ortiz's findings of fact and recommendations, the County Administrator's Office had decided to deny his appeal. Washington claims he sought an evidentiary hearing and a name-clearing hearing and requested reinstatement, but those requests were denied.

Washington filed a four-count complaint in the District of Kansas, alleging that: (1) Sheriff Ash and the County conducted an unconstitutional search, in

---

[1] The Grievance Procedure qualifies that "employees remain 'at will'" and "the Unified Government may terminate an employee's employment by the Unified Government at any time, for any reason." App. at 397.

-4-

violation of 42 U.S.C. § 1983; (2) all defendants deprived Washington of his property interest in continued employment without due process of law, in violation of 42 U.S.C. § 1983; (3) all defendants failed to provide Washington a name-clearing hearing, in violation of 42 U.S.C. § 1983; and (4) the County breached an implied contract created by its written disciplinary policies, in violation of state contract law. The district court granted summary judgment for all defendants on all counts.

## II. Analysis

Washington contends the district court erred in dismissing his federal and state claims. We consider each in turn.

### A. Section 1983 Claims

"Qualified immunity is an affirmative defense to a section 1983 action, providing immunity from suit from the outset." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (alteration omitted). "We review a grant of summary judgment on the basis of qualified immunity de novo." *Harman v. Pollock*, 586 F.3d 1254, 1260 (10th Cir. 2009). To survive summary judgment after a defendant has claimed qualified immunity, the plaintiff must establish (1) the defendant violated a constitutional right, and (2) the right was clearly established. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). In this circuit, a right is clearly established "'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the

right must be as the plaintiff maintains.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196–97 (10th Cir. 2010)).  If the plaintiff meets this two-part test, then the usual analysis applies, with the defendant bearing the burden of showing he is entitled to summary judgment.  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).

Unlike individuals, however, municipalities are not protected by qualified immunity.  *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006).  Thus, granting summary judgment in favor of a municipality is appropriate where the pleadings and supporting materials establish there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  We must view the evidence and resolve all inferences in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A municipality may be liable under § 1983 where the plaintiff identifies an unconstitutional policy that caused the claimed injury.  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–70 (10th Cir. 2013).  But the plaintiff must establish that the municipal employees causing the harm violated the plaintiff's constitutional rights; otherwise, the municipality cannot be held liable.  *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154–55 (10th Cir. 2001).

### 1. *Unreasonable Search*

Washington first argues the district court erred in finding the County's random drug test did not violate the Fourth Amendment's probable cause and warrant requirements. He claims there are genuine issues of material fact as to whether the County is entitled to an exemption from the probable cause requirement for employees in safety sensitive positions. We disagree.

"When a government employer requires its employees to submit to a urinalysis test for the purpose of detecting illegal drug use, the test is a search subject to the Fourth Amendment and must be reasonable." *19 Solid Waste Dep't Mechanics v. City of Albuquerque*, 156 F.3d 1068, 1072 (10th Cir. 1998). Ordinarily, a search "must be based on individualized suspicion of wrongdoing" in order to meet the Fourth Amendment's reasonableness requirement. *Chandler v. Miller*, 520 U.S. 305, 313 (1997). But when the government asserts a "special need" beyond ordinary crime detection, we have found suspicionless drug testing reasonable if the government's interests outweigh the individual's privacy interests. *19 Solid Waste*, 156 F.3d at 1072.

Before we balance the interests on each side, however, "the government must . . . be able to show, as a threshold matter, that its case for suspicionless testing is legitimate." *Id.* at 1073. Thus, "the special need showing is best viewed as a preliminary examination of the government interests at stake." *Id.* Moreover, as we explained in *Dubbs v. Head Start, Inc.*,

the [special need] cases seem to share at least these features: (1) an exercise of governmental authority distinct from that of mere law enforcement such as the authority as employer, the *in loco parentis* authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing.

336 F.3d 1194, 1213–14 (10th Cir. 2003).

In evaluating whether the government has demonstrated a legitimate special need, we examine (1) "whether the testing program was adopted in response to a documented drug abuse problem or whether drug abuse among the target group would pose a serious danger to the public"; and (2) whether the testing scheme would effectively detect and deter drug use. *19 Solid Waste*, 156 F.3d at 1073.

In the absence of a documented drug problem among employees, courts have nevertheless concluded the government's concerns are real if drug use among the tested individuals would threaten workplace or public safety. *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 668–71 (1989) (concluding government had a compelling interest in preventing drug use among Customs employees charged with drug interdiction at the nation's borders); *19 Solid Waste*, 156 F.3d at 1074 (determining government's significant interest in preventing waste department mechanics from "operat[ing] heavy machinery in

a dangerous manner, endangering others in the shop, or conduct[ing] repairs improperly, [thus] imperiling individuals on the public streets" satisfied first part of special need showing). *Cf. Neumeyer v. Beard*, 421 F.3d 210, 214 (3d Cir. 2005) (noting the "ready applicability of the special needs doctrine to the prison context" given the need "'to safeguard institutional security'") (quoting *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982)).

Further, courts have characterized random, rather than scheduled, drug tests as an effective method of detecting and deterring drug use. *See Skinner v. Ry. Labor Exec. Ass'n*, 489 U.S. 602, 630 (1989); *Int'l Union v. Winters*, 385 F.3d 1003, 1013 (6th Cir. 2004) (noting random drug tests are "more efficacious than one time tests at achieving their intended result"); *19 Solid Waste*, 156 F.3d at 1074 (finding government failed to satisfy second part of special need showing in part because it administered drug tests in "predictable intervals").

Here, the County argues it administers random drug tests to juvenile lieutenants to "ensur[e] the safety and welfare of the children housed in the Juvenile Detention Center." Aple. Br. 35. We find this special need is legitimate. First, Washington "perform[s] a job in which safety is an important concern." *See 19 Solid Waste*, 156 F.3d at 1074. The County serves as guardian to juveniles residing at the Juvenile Detention Center and has a significant interest in ensuring the safety of those under its full-time care—many of whom may have struggled with substance abuse, including use of illegal drugs. By preventing drug use

-9-

among its employees who have interaction with and access to residents, the County ensures that interaction with the youth are handled by non-impaired individuals, that drugs have a lower likelihood of finding their way into the facility, and that juvenile lieutenants serve as role models for the youth. Second, the County's testing program is random, which minimizes the possibility employees will evade detection and maximizes the deterrent effect of the program.

Having found a legitimate special need for the random drug testing policy, we balance Washington's privacy interests against the County's interests in safety and welfare to determine whether testing Washington was reasonable in these circumstances. *See 19 Solid Waste*, 156 F.3d at 1072. First, we consider "the scope of the legitimate expectation of privacy at issue" and "the character of the intrusion that is complained of." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658 (1995). As a correctional employee, Washington's expectation of privacy was diminished. *See, e.g.*, *True v. Nebraska*, 612 F.3d 676, 681 (8th Cir. 2010) ("While correction officers retain certain expectations of privacy, it is clear that, based upon their place of employment, their subjective expectations of privacy are diminished while they are within the confines of the prison."). Moreover, the drug test was minimally invasive: Washington provided the urine sample in a restroom with the door closed, without a monitor. *Cf. Vernonia*, 515 U.S. at 658

(when urine samples are provided in an enclosed stall, "the privacy interests compromised by the process of obtaining the urine sample are . . . negligible").

Next, we consider whether the government has asserted an interest "*important enough* to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." *Vernonia*, 515 U.S. at 661 (emphasis in original).

Here, the County has identified two interests important enough to justify randomly testing Washington. The first involves the unique situation of working with juveniles in an educational setting. When an employee has an *in loco parentis* custodial and educational relationship with minors—especially at-risk minors—that employee's illegal drug use presents a risk of harm to the minors. *Cf. Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 384 (6th Cir. 1998) (finding a compelling government interest to drug test new teachers "considering their unique *in loco parentis* obligations and their immense influence over students"); *Aubrey v. Sch. Bd. of Lafayette Par.*, 148 F.3d 559, 564–65 (5th Cir. 1998) (allowing suspicionless searches of school employees who interact regularly with students). And, in upholding a school district's random drug-testing policy for student athletes, the Supreme Court has recognized there is a strong governmental interest in deterring drug use by adolescents, who are more susceptible to impairment and addiction. *Vernonia*, 515 U.S. at 661–62.

The County's second interest involves the situation of working in a correctional facility. If an employee has law enforcement duties, access to and direct contact with inmates, or may be called on to secure a correctional facility, that employee's illegal drug use presents a significant potential threat to the inmates and the security of the facility. *See Winters*, 385 F.3d at 1012 (recognizing state asserted legitimate special need to randomly drug test such employees, whose impairment "would pose a significant potential threat to the health and safety of themselves and others").

In balancing these interests, we note the Supreme Court has approved suspicionless drug testing of employees in certain safety sensitive positions. *See Skinner*, 489 U.S. at 620–21 (holding the government's "interest in regulating the conduct of railroad employees to ensure safety, like its . . . operation of a government office, school, or prison[,]" justified subjecting employees engaged in safety-sensitive tasks to warrantless drug and alcohol testing). For these positions, the government interest in safety justifies suspicionless testing, because "even a momentary lapse of attention can have disastrous consequences." *Id.* at 628. Here, though the County's Policy on Substance Abuse and Drug and Alcohol Testing lists "juvenile lieutenant" as a safety sensitive position, Washington argues the County's policy should not apply to him, because he primarily performed administrative tasks.

We reject Washington's argument, because the undisputed material facts establish that the County's safety interests apply to his position.[2] Perhaps if Washington's job duties were entirely administrative, or if he were not employed in a juvenile correctional facility, he would have a point. But as Washington himself acknowledged, he was required to report to the floor whenever a fight broke out. The County has a strong interest in ensuring its employees are not impaired in case of an emergency situation. Moreover, Washington filled in for positions that are undeniably safety sensitive, such as driving juveniles to the intake assessment center and supervising juvenile officers on the floor. Washington took on these duties sporadically, such as when a floor lieutenant was running late or sick. Therefore, a random drug testing policy was just as applicable to Washington as it would have been to any full-time floor lieutenant. The frequency or regularity of Washington's contact with residents thus does not affect our conclusion, since his on-call status made paramount his preparedness. *Cf. AFGE Local 1533 v. Cheney*, 944 F.2d 503, 509 (9th Cir. 1991) (upholding Navy's random drug testing of civil employees with access to classified

---

[2] The parties disagree about the nature of Washington's interaction with residents at the Juvenile Detention Center. *Compare, e.g.*, Aplt. Br. 28 ("Washington had no unsupervised contact with those in detention in the facility."), *with* Aple. Br. 10 ("Washington worked directly with residents on a regular basis."). Washington argues there is a genuine dispute of material fact about whether his position was safety sensitive. But the undisputed facts relied on by the district court establish Washington had some interaction with and access to juvenile residents, thus implicating the County's safety concerns.

-13-

information, noting "[c]onsiderations of other characteristics of the employees' jobs, including the frequency with which the employees are likely to be exposed to classified information, are irrelevant").

Washington also had access to the entire secured Juvenile Detention Center, creating a risk he could expose residents to illegal drugs. *Cf. Winters*, 385 F.3d at 1010 ("[T]he introduction of alcohol and drugs into correctional facilities, which prisoners could obtain possession of, presents a severe threat to security and to the safety of correctional employees and prisoners, since the use of drugs by prisoners can lead to disruptive behavior."); *Am. Fed'n of Gov't Emps., AFL-CIO v. Roberts*, 9 F.3d 1464, 1467 (9th Cir. 1993) ("Drugs can reach prisoners only by smuggling. . . . The employees have substantially greater opportunity to smuggle drugs than do the visitors.").

Even if access alone would not be sufficient to justify suspicionless testing, we consider all the factors and conclude the County's interests are important enough to outweigh Washington's diminished privacy interests, and thus the random drug test was reasonable. The balance we strike today is specific: the government's interests, while important in this case, might not apply to all employees in a correctional facility. *See, e.g.*, *Winters*, 385 F.3d at 1010 (allowing drug testing of non-custodial correctional facility employees who had unsupervised access to and direct contact with prisoners); *Taylor v. O'Grady*, 888 F.2d 1189, 1199 (7th Cir. 1989) (allowing drug testing of only those correctional

-14-

facility employees who had regular prisoner contact or had opportunities to smuggle drugs to prisoners).

Because the County's interests outweigh Washington's privacy interests, Washington has not proven a constitutional violation, and neither Sheriff Ash nor the County can be subject to § 1983 liability.[3] Therefore, we affirm the district court's grant of summary judgment on Washington's Fourth Amendment claims.

### 2. Deprivation of Property Without Due Process of Law

Next, Washington contends the Sheriff's practices and the County's personnel policies establish he had a protected property interest in continued employment at the Juvenile Detention Center.

The Due Process clause of the Fourteenth Amendment prohibits the government from depriving an individual of life, liberty, or property without due process of law. U.S. Const. amend. XIV. "To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998).

---

[3] Even if Washington had established a constitutional violation, Sheriff Ash still would not be subject to § 1983 liability, because Washington fails to identify clearly established law from any jurisdiction that would have put Ash on notice his actions were unconstitutional.

We look to state law to determine whether Washington has a protected property interest. *Darr v. Town of Telluride*, 495 F.3d 1243, 1251 (10th Cir. 2007). Under Kansas law, public employment is presumptively at-will. *Robert v. Bd. of Cty. Comm'rs of Brown Cty.*, 691 F.3d 1211, 1220 (10th Cir. 2012). "To override this presumption, a written contract must expressly fix the duration of employment or otherwise limit the employer's ability to discharge." *Id.*

Washington argues Kan. Stat. Ann. § 19-805(d) requires the Sheriff to act in accordance with personnel policies and procedures, and the limitations outlined in the Policy on Substance Abuse and the HR Guide thus give rise to a property right. But none of the policies Washington identifies limited the Sheriff's ability to discharge him. Although the HR Guide suggests suspension would have been appropriate for a first-time violation, the Guide is clear that its suggestions do not alter an employee's at-will status, and it provides that other discipline is appropriate depending on the circumstances.

"Absent an express agreement, Kansas law enforces an implied employment contract only when the circumstances demonstrate a mutual intent to contract." *Robert*, 691 F.3d at 1220. Personnel policies alone are insufficient to create an implied employment contract. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1138 (10th Cir. 1994). Here, as explained above, the written policies do not demonstrate a mutual intent to modify Washington's at-will status. And contrary to Washington's argument, the existence of a grievance procedure also fails to

show such mutual intent. *See Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1129 (10th Cir. 2001) ("It is well established in this circuit, however, that procedural protections alone do not create a claim of entitlement to continued public employment. Rather, a legitimate claim of entitlement to continued public employment arises only when there are substantive restrictions on the ability of the employer to terminate the employee.").

Because Washington does not present "independent, probative evidence bearing on the issue of the defendant's intent[,]" he cannot withstand summary judgment. *Farthing*, 39 F.3d at 1139. "Absent a property interest, there can be no violation of Due Process." *Id.* at 1140. Accordingly, we affirm the district court's grant of summary judgment.

### 3. *Deprivation of Liberty Without Due Process of Law*

Third, Washington contends he is entitled to a name-clearing hearing, because he was deprived of a liberty interest.

If a public employee can show that his liberty interest in "his good name and reputation as they relate to his continued employment" was damaged, due process affords an adequate name-clearing hearing. *McDonald v. Wise*, 769 F.3d 1202, 1212–13 (10th Cir. 2014). Here, in granting summary judgment for the defendants, the district court concluded Washington was not entitled to a name-clearing hearing, because the pre-trial order lacked any reference to a damaged liberty interest. Washington now argues the district court abused its discretion in

giving weight to the pre-trial order, where Washington mistakenly asserted a *property* interest in employment, rather than a *liberty* interest in his good name and reputation.

"The pre-trial order supersedes the pleadings and becomes the governing pattern of the lawsuit." *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir. 1965). Thus, it is difficult to see how the district court abused its discretion in confining the issues to those in the pre-trial order. But even if the district court should have considered the merits of Washington's claim, defendants would still be entitled to summary judgment. Washington makes only a conclusory allegation of a damaged liberty interest without factual or legal support, and without explaining why the post-termination process he received failed to satisfy due process. This is wholly insufficient to demonstrate a constitutional violation. *See, e.g.*, *Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (holding that "conclusory allegations with no citations to the record or any legal authority for support" disentitled plaintiff to review).

Therefore, we affirm the district court's grant of summary judgment on Washington's liberty interest claim.

**B. State Contract Law Claim**

Washington's sole state law claim is that he is entitled to reinstatement with back pay, because the County breached an implied contract created by its written policies. Because we have already concluded Washington failed to

establish the County's conduct or policies created an implied employment contract, *see supra* Section II.A.2, we agree with the district court that the County is entitled to summary judgment on Washington's breach of contract claim.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's order granting the defendants' motion for summary judgment on all claims.