**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1932**

———————

JACOBY L. GARRETT,

　　　　　Plaintiff – Appellee,

　　v.

HAROLD W. CLARKE, individually and in his official capacity as Director of the
Virginia Department of Corrections; RICHARD A. DAVIS, individually and in his
official capacity as Chief Information Officer of the Virginia Department of
Corrections; FELICIA V. STRETCHER, individually and in her official capacity as
Information Technology Administrators and Operations Manager for the Virginia
Department of Corrections,

　　　　　Defendants – Appellants,

　　and

DEPARTMENT OF CORRECTIONS, COMMONWEALTH OF VIRGINIA,

　　　　　Defendant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  Robert E. Payne, Senior District Judge.  (3:19-cv-00835-REP)

———————

Argued:  May 4, 2022　　　　　　　　　　　　　　Decided:  July 25, 2023

———————

Before WILKINSON, RICHARDSON, and RUSHING, Circuit Judges.

———————

Reversed by published opinion.  Judge Rushing wrote the opinion, in which Judge
Wilkinson and Judge Richardson joined.  Judge Wilkinson wrote a concurring opinion.

———————

**ARGUED:** Graham Keith Bryant, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Robert Jackson Allen, THORSENALLEN LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Mark R. Herring, Attorney General, Ronald Nicholas Regnery, Senior Assistant Attorney General, Ryan S. Hardy, Assistant Attorney General, Kati K. Dean, Assistant Attorney General, Michelle S. Kallen, Acting Solicitor General, Brittany M. Jones, Deputy Solicitor General, Laura H. Cahill, Assistant Attorney General, Rohiniyurie Tashima, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Jesse A. Roche, THORSENALLEN LLP, Richmond, Virginia, for Appellee.

———————

RUSHING, Circuit Judge:

Jacoby L. Garrett worked as a Telecommunications Network Coordinator for the Virginia Department of Corrections (VDOC). After VDOC fired Garrett for declining a random drug test, Garrett sued, alleging that VDOC employees violated his Fourth Amendment rights by applying VDOC's drug testing policy to him. The defendants asserted qualified immunity and moved to dismiss. The district court denied the motion, concluding that general constitutional principles clearly establish Garrett's right to be free from suspicionless drug testing. We disagree. Applying the correct standard, the defendants are entitled to qualified immunity.

I.

Because this appeal arises from the resolution of a motion to dismiss, we accept the complaint's allegations as true and draw all reasonable factual inferences in Garrett's favor. *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317–318 (4th Cir. 2019). Garrett began working as a VDOC Telecommunications Network Coordinator in 2016. About 70 percent of his work consisted of assisting VDOC employees with their mobile devices, although he also directed IT projects involving phones, data connections, and video streaming and conferencing. Garrett worked primarily at VDOC's headquarters. VDOC did not confine inmates at headquarters, but low-risk offenders worked there, and Garrett had "ca[su]al contact" with those offenders who, for example, worked in the cafeteria. J.A. 21. Garrett also "occasional[ly]" traveled to prisons to work on IT projects, where he had "indirect contact" with inmates. J.A. 20–21. Garrett was not responsible for monitoring inmates and did not carry a gun.

3

When he was hired, Garrett acknowledged receipt of VDOC's Operating Procedure 135.4, *Alcohol and Other Drug Testing* (OP 135.4), which subjected all salaried VDOC employees to random drug testing. Employees selected for random testing had to report by the end of the business day, and failure to complete a required drug test was grounds for termination. Oral fluid testing, i.e, a buccal swab, was the typical and preferred method of testing.

On the afternoon of June 28, 2018, Garrett was selected for a random drug test and reported to Shenda Allen, a VDOC personnel assistant, for testing. While Allen retrieved the necessary supplies, Garrett received a phone call indicating that someone—he believed his supervisor—was looking for him. When Allen returned, Garrett told her that his supervisor was looking for him, and she replied something to the effect of "I'll get you next time." J.A. 25. Garrett left the testing site and did not return to complete his test that workday.

The next day, Garrett left on a previously approved one-week vacation. The same day, Allen reported that Garrett had failed to complete his drug test, and Richard Davis, who was VDOC's Chief Information Officer and tasked with enforcing its operating procedures, decided to terminate Garrett. After Garrett returned, his supervisor, Felicia Stretcher, informed him that VDOC was placing him on pre-disciplinary leave. Garrett's termination became effective on July 17.[1]

---

[1] Garrett challenged his termination in administrative proceedings, which have led to considerable state-court litigation.

Garrett sued VDOC, Stretcher, Davis, and Harold Clarke, VDOC's Director of Corrections, in federal court. He asserted three claims, but only Count 1—a claim under 42 U.S.C. § 1983 against Clarke, Davis, and Stretcher (collectively, Defendants) in their individual capacities—is before us on appeal. In Count 1, Garrett alleges that Defendants violated his Fourth Amendment rights by "subjecting [him] to an unconstitutional drug testing policy, OP 135.4, and terminating him for an alleged refusal of an unconstitutional search of his person."[2] J.A. 31. He seeks compensatory and punitive damages as well as other relief.

Defendants asserted qualified immunity and moved to dismiss Count 1. The district court denied the motion. *See Garrett v. Clarke*, 552 F. Supp. 3d 539, 557–562 (E.D. Va. 2021). The court reasoned that the facts alleged in the complaint did not support a finding that VDOC had an important interest in drug testing Garrett and concluded that general constitutional principles "clearly establish[] that in the absence of an important government interest, the Fourth Amendment forbids suspicionless drug testing of government employees." *Id*. at 561. Defendants appealed. We have jurisdiction pursuant to the collateral order doctrine, and we review the qualified immunity defense de novo. *Adams v. Ferguson*, 884 F.3d 219, 224, 226 (4th Cir. 2018).

---

[2] Because he did not actually undergo drug testing, Garrett does not claim that he was subjected to an unreasonable search. Rather, he asserts that OP 135.4's drug testing requirement was an unconstitutional condition on his government employment. The parties do not meaningfully address this distinction.

5

II.

A.

"Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Davison v. Rose*, 19 F.4th 626, 640 (4th Cir. 2021) (internal quotation marks omitted). Therefore, Defendants are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"[3] *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We have discretion to "'skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case,'" which we choose to do here. *Brown v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). In our Circuit, Defendants bear the burden of proving that the unlawfulness of their conduct was not clearly established. *Stanton v. Elliott*, 25 F.4th 227, 233 & n.5 (4th Cir. 2022).

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted); *see Wilson v.*

---

[3] The Supreme Court and our Court have extended qualified immunity to government officials' choices in making and enforcing government policies. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865–1869 (2017); *Davison*, 19 F.4th at 640–641. Garrett does not contest the applicability of qualified immunity doctrine here.

*Layne*, 526 U.S. 603, 614–615 (1999). While "a case directly on point" is not necessary for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). To determine whether a right was clearly established, we look to "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose," and ordinarily need look no further. *Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. 2013) (internal quotation marks omitted). In the absence of controlling authority, however, "a robust consensus" of persuasive authority may demonstrate the existence of a rule "that every reasonable official would know." *Wesby*, 138 S. Ct. at 589–590 (internal quotation marks omitted); *see Ashcroft v. al-Kidd*, 563 U.S. 731, 741–742 (2011); *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020). And in "the rare 'obvious case,'" general constitutional standards can clearly establish a right, "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)); *see Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam).

The "clearly established" standard also requires that the contours of the legal rule be "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (internal quotation marks omitted). Therefore, "[b]efore deciding if a right was clearly established, we must first define the right at issue with specificity." *Knibbs v. Momphard*, 30 F.4th 200, 223 (4th Cir. 2022). We turn to that task now.

7

B.

Garrett asserts a right to be free from unreasonable, suspicionless searches in the form of random drug tests. *See Maryland v. King*, 569 U.S. 435, 446 (2013) (concluding that a buccal swab is a search). Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989) (internal quotation marks omitted). Typically, searches "must be based on individualized suspicion of wrongdoing," *Chandler v. Miller*, 520 U.S. 305, 313 (1997), unless an exception applies, such as "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable," *Skinner*, 489 U.S. at 619 (internal quotation marks omitted).

When evaluating an assertion of special needs, courts balance competing governmental and privacy interests. *Id*. To support a suspicionless search in this context, the government's "proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318. In the absence of such a need, "the Fourth Amendment precludes the suspicionless search." *Id*. at 323.

Under this framework, we first consider "the nature of [Garrett's] privacy interest" and "the character of the intrusion." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654, 658 (1995). Garrett worked in the corrections industry, which is "highly regulated." *Int'l Union v. Winters*, 385 F.3d 1003, 1012 (6th Cir. 2004). Employees who choose to

8

participate in such industries often have a reduced expectation of privacy. *See Skinner*, 489 U.S. at 627; *Vernonia*, 515 U.S. at 657. Indeed, Garrett acknowledged the drug testing requirement when he was hired. *See Carroll v. City of Westminster*, 233 F.3d 208, 211– 212 (4th Cir. 2000) (reasoning that the privacy intrusion caused by any particular drug test is "less severe" when the officer knows in advance that he is subject to random drug testing). As for the character of the proposed intrusion, a buccal swab is minimally invasive. *King*, 569 U.S. at 446, 463–464.

Yet even with a diminished expectation of privacy and a minimal intrusion, OP 135.4 must still be justified by a special need. *See Chandler*, 520 U.S. at 318. Considering Garrett's job responsibilities as alleged in the complaint, Defendants assert special needs related to prison security—as implicated by Garrett's contact with inmates and the concomitant opportunity for blackmail, bribery, and funneling of contraband—as well as public confidence in a law-abiding corrections workforce.[4] *See, e.g., Braun v. Maynard*, 652 F.3d 557, 563 (4th Cir. 2011) (discussing the "intractable problems of drug smuggling and drug use within prisons" (internal quotation marks omitted)); *Carroll*, 233 F.3d at 211 (acknowledging that drug use "'creates risks of bribery and blackmail against which the Government is entitled to guard'" (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 674 (1989))); *cf. Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (according

---

[4] Defendants assert additional special needs based on facts outside the complaint— in particular, findings about Garrett's job responsibilities in a state Hearing Officer decision that has since been overturned on appeal. Garrett urges us not to consider those findings. We can resolve this appeal even without considering the additional special needs Defendants assert based on those findings.

"wide-ranging deference" to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

Given Garrett's diminished privacy interest, the minimal nature of the invasion, and VDOC's proffered special needs in the corrections context, the question is whether Defendants could have reasonably believed they acted lawfully in subjecting Garrett—a VDOC IT employee who allegedly had casual and occasionally indirect contact with prisoners—to random drug testing. *See Anderson v . Creighton*, 483 U.S. 635, 638–639 (1987). Stated differently, was it clearly established in June 2018 that, based on the facts as alleged in the complaint, VDOC's proffered interests in prison security and a law-abiding corrections workforce were not substantial enough to override Garrett's asserted privacy interest in avoiding a suspicionless drug test? *See Chandler*, 520 U.S. at 318. To decide this question, we turn to the caselaw.

## C.

A handful of cases set the legal standard for suspicionless drug testing in this Circuit. The Supreme Court has approved suspicionless employee drug testing in two cases—*Skinner* and *Von Raab*—and rejected it in a third, *Chandler*.[5] In *Skinner*, the Court considered federal regulations that mandate blood and urine testing of railroad employees involved in train accidents and authorize breath and urine tests for railroad employees who

---

[5] The Supreme Court has also approved suspicionless drug testing of students involved in athletics and competitive extracurricular activities. *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 825 (2002); *Vernonia*, 515 U.S. at 664–665.

violate certain safety rules. 489 U.S. at 606. The Court held that ensuring the safety of the traveling public and the railroad employees themselves was a compelling government interest that outweighed the employees' expectations of privacy. *Id.* at 621, 632–633. In *Von Raab*, the Court evaluated a requirement that Customs Service employees working in drug interdiction or who carry firearms must submit to warrantless urine testing. 489 U.S. at 659. The Court found it "readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Id.* at 670. That interest could be harmed if the employees were, "because of their own drug use, unsympathetic to their mission of interdicting narcotics" or susceptible to bribes. *Id.* at 669–670. As for employees who carried firearms, the Court reasoned that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.* at 670–671. These special needs outweighed the employees' privacy expectations. *Id.* at 677.

By contrast, in *Chandler*, the Supreme Court concluded that a state law requiring certain political candidates to submit to drug testing was unconstitutional. 520 U.S. at 309–310. The State claimed an interest in preventing unlawful drug use by individuals holding high state office, which it asserted could call into question their judgment and integrity, jeopardize the discharge of public functions and antidrug efforts, and undermine public confidence. *Id.* at 318. The Court rejected the State's interests as merely "symbolic" and lacking "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Id.* at 318–319, 322. The State offered "no evidence of a drug

11

problem among the State's elected officials," those officials typically did not "perform high-risk, safety-sensitive tasks," and the drug test "aid[ed] no interdiction effort." *Id.* at 321–322. Because "public safety [was] not genuinely in jeopardy," the Supreme Court held that "the Fourth Amendment preclude[d] the suspicionless search." *Id.* at 323.

Our Court has applied this constitutional framework in two relevant cases. *See Carroll*, 233 F.3d 208; *Thomson v. Marsh*, 884 F.2d 113 (4th Cir. 1989) (per curiam). In *Thomson*, we upheld the Army's random drug testing of civilian employees with access to areas where experiments with chemical warfare agents were performed. 884 F.2d at 114–115. One of the plaintiffs was a pipefitter who worked on fittings for chemical test chambers and toxic waste drains. Even though he did not work directly with the "extremely lethal" chemicals, we concluded that the government's safety interest outweighed his privacy expectation because he had access to laboratories where experiments with the chemicals were conducted and he might be required to respond to emergencies in those laboratories. *Id.* at 115.

In *Carroll*, after receiving tips that a police officer was using drugs, the police chief asked a physician to secretly test the officer during an examination. 233 F.3d at 210. We found the government's interests—in preventing armed officers from impairing their judgment, ensuring that those engaged in drug interdiction are not themselves drug users, and guarding against the risk of bribery and blackmail—compelling. *Id.* at 211. The officer had a reduced expectation of privacy because he consented to suspicionless drug tests at the beginning of his employment and worked in a safety-sensitive profession. *Id.* at 211–

212. We concluded that the government's interests outweighed the officer's and upheld the search. *Id.* at 212.

These cases do not clearly establish that applying VDOC's drug-testing policy to Garrett was unconstitutional. None of these cases arose in the prison context or directly implicate concerns about prison contraband. In broad strokes, the relevant binding authority establishes that a suspicionless drug test calibrated to address a genuine safety risk may be reasonable. *See Chandler*, 520 U.S. at 323. And the wholly symbolic special need asserted in *Chandler*—the only case to disapprove a suspicionless drug test—bears no resemblance to the interests in prison safety and a sober corrections workforce that Defendants assert here. Put simply, no controlling authority precluded prison officials in this Circuit from reasonably believing that applying OP 135.4 to Garrett was consistent with his Fourth Amendment rights. *See Anderson*, 483 U.S. at 638.

The parties discuss cases in which other courts of appeals have upheld suspicionless drug testing of certain categories of corrections employees. *See*, *e.g.*, *Winters*, 385 F.3d at 1012–1013 (upholding testing of probation and parole officers and field service assistants, employees who work within the perimeter of the State's correctional facilities, and employees who provide health care and psychological care to prisoners or other individuals in state custody); *Taylor v. O'Grady*, 888 F.2d 1189, 1196–1201 (7th Cir. 1989) (upholding testing of "those employees who come into regular contact with prisoners, or who have opportunities to smuggle drugs to prisoners" but rejecting testing of administrative personnel with "no regular access to inmate population," "no reasonable opportunity to smuggle drugs" to inmates, and "no access to firearms"); *McDonell v. Hunter*, 809 F.2d

13

1302, 1308–1309 (8th Cir. 1987) (upholding testing of "employees who have regular contact with prisoners on a day-to-day basis in medium or maximum security prisons"); *Am. Fed'n of Gov't Emps. v. Roberts*, 9 F.3d 1464, 1466–1468 (9th Cir. 1993) (upholding testing of "primary law enforcement officers [who had] the opportunity for contact with prisoners"); *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1198–1201 (10th Cir. 2017) (upholding testing of a juvenile corrections officer who primarily performed administrative tasks but worked at a housing facility and had contact with juvenile inmates). In each case, the employees' opportunity for contact with prisoners played a primary role in sustaining a government need weighty enough to justify the testing.

Garrett makes an argument of degree, claiming that he had less prisoner contact or that his position was more attenuated from prison safety than the corrections employees whose searches were upheld in these decisions. But Garrett's argument gets qualified immunity backwards. The question is not whether the law clearly *authorized* Defendants' actions; they are protected from personal liability unless the law clearly *prohibited* their conduct. Garrett further likens his position to that of the administrative personnel in *Taylor*, whom the Seventh Circuit held could not be tested because they did not "come into regular contact with prisoners" or "have opportunities to smuggle drugs to prisoners." 888 F.2d at 1199. Even if we accepted Garrett's comparison of his allegations to those facts, however, one out-of-circuit case is not a "'robust consensus.'" *Wesby*, 138 S. Ct. at 589–590 (quoting *al-Kidd*, 563 U.S. at 742). These nonbinding decisions, even considered together, do not reveal the existence of a constitutional rule "clear enough that every

14

reasonable official would interpret it," *id.* at 590, to forbid suspicionless drug testing of corrections IT employees who have "ca[su]al contact with low-risk offenders" in their workplace and "occasional," "indirect contact" with inmates within prison walls, J.A. 21.

D.

The district court found it "clearly establishe[d] that in the absence of an important government interest, the Fourth Amendment forbids suspicionless drug testing of government employees." *Garrett*, 552 F. Supp. 3d at 561. Because the court had previously concluded that the government lacked an important interest in drug testing Garrett, it denied Defendants qualified immunity. The district court's analysis went astray because its "formulation of the clearly established right was far too general." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam).

The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted); *see, e.g.*, *Rivas-Villegas*, 142 S. Ct. at 7–9; *Bond*, 142 S. Ct. at 11–12; *Emmons*, 139 S. Ct. at 503–504; *White*, 137 S. Ct. at 552–553; *Mullenix v. Luna*, 577 U.S. 7, 12–14 (2015) (per curiam); *al-Kidd*, 563 U.S. at 742; *Brosseau*, 543 U.S. at 198–199; *Anderson*, 483 U.S. at 639–641. Doing so "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). It is of course true, as the district court said, that the State cannot randomly drug test an employee without a special need important enough to override the individual's privacy interest. But that rule is too general to eliminate immunity because "the unlawfulness of the [Defendants']

15

conduct does not follow immediately from the conclusion that the rule was firmly established." *Wesby*, 138 S. Ct. at 590 (internal quotation marks and brackets omitted). The proper question, instead, is whether precedent clearly established that Defendants lacked a special need of such importance in these circumstances. As we have explained, it did not.

We recognize there exists "the rare obvious case," where a general standard can clearly establish the answer. *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted); *see Rivas-Villegas*, 142 S. Ct. at 8; *see, e.g.*, *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (finding it "obvious" based on "a general constitutional rule" that a prisoner cannot be housed for six days in a cell "teeming with human waste" (internal quotation marks omitted)). But this is not an obvious case. And "specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Bond*, 142 S. Ct. at 11–12 (quoting *Mullenix*, 577 U.S. at 12).

The district court relied on our decision in *Ray v. Roane*, 948 F.3d 222 (4th Cir. 2020), where we denied qualified immunity at the pleading stage to a police officer accused of killing the plaintiff's dog. Although we found no "directly on-point, binding authority" establishing that the officer's actions in these particular circumstances were unreasonable, *id.* at 229 (internal quotation marks omitted), we relied on the general principle, established in a prior case, "that the reasonableness of the seizure of a dog depends on whether the governmental interest in safety outweighs the private interest in a particular case," *id.* at 230 (citing *Altman v. City of High Point*, 330 F.3d 194, 203–205 (4th Cir. 2003)). Because

16

the complaint alleged facts indicating that a reasonable officer would not have had "*any safety rationale at all*" for shooting the dog, we concluded that this "broad[] principle[] alone" would have made it "manifestly apparent" to a reasonable officer that shooting the dog was unlawful. *Id.* (internal quotation marks omitted).

By contrast, based on the facts as alleged in the complaint here, VDOC has some degree of government interest in drug testing Garrett. Whether that interest amounts to a "special need" within the meaning of Fourth Amendment jurisprudence is a debatable legal question. By baking into its analysis the absence of a sufficient special need, the district court glossed over the central question for immunity purposes: whether every reasonable official in Defendants' position would understand that VDOC's proffered interests were not substantial enough to override Garrett's privacy interest. In view of existing law, the constitutionality of Defendants' drug testing is simply not "beyond debate." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted).

### III.

For these reasons, Defendants are entitled to qualified immunity from personal liability for the civil damages sought under Count 1.

*REVERSED*

17

WILKINSON, Circuit Judge, concurring:

The majority opinion is correct that this claim can be dismissed on qualified immunity grounds. I readily concur in its opinion with appreciation for its fine analysis.

I add the additional thought that the defendant's random drug testing policy is also quite reasonable on its merits. Drugs are the single greatest problem in many penal institutions today. The drug culture of the streets is all too easily replicated in the institutional setting. It is not surprising that the indicia of street trafficking are present in many a prison: the turf jealousy, the formation of gang hierarchies, the retaliation for dubious loyalty and unpaid drug debts, are all too readily transferred from the "outside" to within the prison walls.

Prison administrators know this. Courts are likewise very well aware of it. Tensions over drugs can flare at any moment. Thus, as the majority opinion recognizes, prison itself often supplies the special need that justifies random drug testing. *See Neumeyer v. Beard*, 421 F.3d 210, 214 (3d Cir. 2005) (noting the "ready applicability of the special needs doctrine to the prison context").

It is natural to view the drug culture primarily as a serious problem for prison administrators. But the harm to the inmates themselves is every bit as real. Drugs not only retard rehabilitation efforts. Their presence also ensures that oppressive measures will be visited upon those lower-rung inmates least able to fend for themselves. A closed environment meant to provide supervision often only intensifies the harms.

It is true that the plaintiff himself is an employee, not an inmate. But employees are not exempt from the payoffs and blackmail that are often part and parcel of a prison drug

18

trade. Nonetheless, the need for drug testing may fairly be seen by corrections officials as less urgent for employees. The more intrusive blood and urine samples may be less fitting for those employees than for prisoners themselves. The assessment of the need for various testing methodologies for various classes in the prison environment is best made by authorities who work in that setting day in and day out and who have an overall sense of an institution's problems and challenges that judges are hard pressed to match.

The corrections administrators here did in fact adopt the least intrusive method of testing by requiring the plaintiff to submit merely to a cheek swab. This can hardly be a Fourth Amendment violation. Such a test amounts to no more than an inconvenient blip in the business of the day.

A focus on the unobtrusive methodology of this particular test makes good sense. It spares courts the need to examine this or that particular feature of this or that particular job. It relieves courts of the need to make fine-tuned and obscure distinctions which will leave corrections officials puzzled over what is permissible for whom and what is not. Courts should seek ways to avoid micromanaging prisons, and at least in this case, the focus on a common testing methodology for employees helps us keep our distance.

Finely grained rulings, grounded on finely spun distinctions, are quite inconsistent with the way our federal system is supposed to work. The incorporation of the Bill of Rights against the states has had a unifying and often beneficial effect in instilling respect for basic rights and liberties throughout the land. I had not supposed, however, that this incorporation was meant to erode all remaining vestiges of state sovereignty.

19

State sovereignty is often at its peak where institutional governance of state institutions such as prisons and schools is concerned. *See Meachum v. Fano*, 427 U.S. 215, 229 (1976) (prisons); *United States v. Lopez*, 514 U.S. 549, 565–66 (1995) (schools). If state courts wish to rule this or that drug testing policy to be violative of state law, that is one thing. But federal courts should resist the temptation to plaster some uniform rule on multiple states via a circuit court ruling or throughout the country via a decision of the Supreme Court.

I find no problem with this prison policy under the Fourth Amendment. Whether the states wish to rule the policy unlawful or adopt some alternative is their prerogative, not ours. With that said, I happily join the fine qualified immunity analysis requiring dismissal of the claim.

20